UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JE-TARRE WASHINGTON, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:20-cv-173 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| MIAMI COUNTY, *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

**ENTRY AND ORDER GRANTING, IN PART, THE MOTION FOR SUMMARY
JUDGMENT OF DEFENDANTS MIAMI COUNTY BOARD OF
COMMISSIONERS, PERRY GULLETTE, DAVE DUCHAK, MICHAEL
MARION, NATHAN COLLETTE, KYLE LONGMAN, RYAN CARSON,
JASON GOFF, AND KENNETH WELBAUM (DOC. NO. 78); GRANTING, IN
PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. NO.
81); DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER
COUNTS 6, 7, 10, 11, 12, 13, 14, 15, 16, 22, 23, 26, 27, 28, 29, 30, 31, 36, 37, 38,
AND 39 AND, THEREFORE, DISMISSING THE REMAINING CLAIMS
WITHOUT PREJUDICE TO REFILING IN STATE COURT; AND
TERMINATING THE CASE**

---

This case involves a variety of claims brought by an incarcerated individual, Plaintiff Je-
Tarre Washington ("Washington"). (*See* Doc. No. 30.) Pending before the Court are two motions
for summary judgment. The first motion is brought by nine defendants: Miami County Board of
Commissioners ("Miami County"), Perry Gullette ("Gullette"), Dave Duchak ("Duchak"),
Michael Marion ("Marion"), Nathan Collette ("Collette"), Kyle Longman ("Longman"), Ryan
Carson ("Carson"), Jason Goff ("Goff"), and Kenneth Welbaum ("Welbaum" and, collectively,
the "Miami Defendants"). (Doc. No. 78.) The second motion is brought by the other defendants:
Montgomery County Board of Commissioners ("Montgomery County"), Rob Streck ("Streck"),
Jeremy Roy ("Roy"), Greg Hoskins ("Hoskins"), and David Williams ("Williams" and,

collectively, the "Montgomery Defendants"). (Doc. No. 81.) As a general matter, all of the defendants are either a municipality's board of commissioners (Miami County and Montgomery County), are affiliated with a county's sheriff's office (Duchak, Marion, Collett, Carson, Welbaum, Streck, and Roy), or are a corrections officer at a county jail (Gullette, Longman, Goff, Hoskins, and Williams). (*See* Doc. No. 30 at PageID 314-16.)

In their respective motions, the Miami Defendants and the Montgomery Defendants move for an order granting summary judgment on all claims against them, pursuant to Federal Rule of Civil Procedure 56. Despite the Court, *sua sponte*, granting Washington four additional weeks in which to file a response to the motions (*see* Doc. No. 86; S.D. Ohio Civ. R. 7.2(a)(2)), Washington failed to timely file any response. This Court later denied his tardy Motion for Extension of Time to Respond to Summary Judgment, which his counsel filed seventeen days after the (previously extended) deadline to respond to the summary judgment motions. (Doc. No. 91.)

As explained below, the Court finds that both the Miami Defendants and the Montgomery Defendants are entitled to summary judgment in their favor on all federal claims against them. The Court declines to exercise supplemental jurisdiction over the remaining state-law claims. Therefore, the Court **GRANTS, IN PART,** the Motion for Summary Judgment of Defendants Miami County Board of Commissioners, Perry Gullette, Dave Duchak, Michael Marion, Nathan Collette, Kyle Longman, Jason Goff, and Kenneth Welbaum (Doc. No. 78); **GRANTS, IN PART,** the Defendants' Motion for Summary Judgment (Doc. No. 81); declines to exercise supplemental jurisdiction over Counts 6, 7, 10, 11, 12, 13, 14, 15, 16, 22, 23, 26, 27, 28, 29, 30, 31, 36, 37, 38, and 39 and, therefore, dismisses the remaining claims without prejudice to refiling in state court; and **ORDERS** the Clerk of Court to terminate this action from the docket of the United States District Court for the Southern District of Ohio.

## I.     LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Alternatively, summary judgment is denied "[i]f there are 'any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a), (c). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Anderson*, 477 U.S. at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only

the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is "whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

Here, as referenced above, Washington failed to timely respond to either motion for summary judgment, and the Court denied his tardy motion for extension of time to respond. (Doc. No. 86; Doc. No. 91.) However, "a district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded." *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991). This is because the party moving for summary judgment always bears an initial burden. *Celotex*, 477 U.S. at 323; *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 410 (6th Cir. 1992). Specifically, "[t]he court shall grant summary judgment <u>if the movant shows</u> that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added); *see also* Fed. R. Civ. P. 56(c); Fed. R. Civ. P. 56(e) ("[i]f a party … fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … grant summary judgment <u>if</u> the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it") (emphasis added). "The fact

that the non-moving party does not respond, or that the motion may otherwise seem to be unopposed, does not change this requirement or lessen the burden on the moving party or the court." *Guarino*, 980 F.2d at 410.

Therefore, in analyzing a motion for summary judgment to which there is no response by the non-moving party, "the court must review carefully those portions of the submitted evidence designated by the moving party." *Guarino*, 980 F.2d at 410. "Neither the trial nor appellate court, however, will *sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Id.* "Rather, in the reasoned exercise of its judgment the court may rely on the moving party's unrebutted recitation of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'" *Id.* "If such evidence supports a conclusion that there is no genuine issue of material fact, the trial court should determine that the moving party has carried its burden, and 'judgment [ ] shall be rendered forthwith....'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (where the plaintiff had failed to respond to the defendants' motion for summary judgment, affirming the district court's entry of summary judgment for defendants because the district court had properly examined the designated evidence, analyzed the law governing the issues in the case, and determined that the movant's burden had been met).

## II.    BACKGROUND

### A.    Washington's Incarceration at the Jails

At all times relevant to this case, Washington was an inmate at either the Miami County Jail or Montgomery County Jail.  (*See* Doc. No. 30 at PageID 314.)  The lawsuit centers on a period of time, starting on June 25, 2019, when he was incarcerated while facing felony charges in state court.  (Doc. No. 75-23 at PageID 1058.)  His incarceration started at the Miami County Jail, he was transferred to the Montgomery County Jail where he was housed between September 20, 2019

5

and December 9, 2019, and he was then transferred back to the Miami County Jail.[1]  (*Id.*)  Upon
his conviction of those charges in November of 2020, he left the jail to begin his prison sentence.
(*Id.*)  Throughout his stay in the Miami County Jail, Washington engaged in behavior detrimental
to the operation of the jail, including threats and assaults on other inmates, threats and assaults on
corrections officers, and destruction of jail property.  (Doc. No. 72-23 at PageID 811-12.)

      **B.**  **August 18/19, 2019 Incident at the Miami County Jail**

      Washington alleged in his Complaint that, on or about August 18, 2019, Defendant
Longman and Defendant Gullette administered him the wrong medication, Gullette placed
Washington in a chokehold when Washington insisted on receiving medical attention, and
Washington was denied medical care after this alleged attack (the "August 18/19 Incident").  (Doc.
30 at PageID 317-320.)

      Based on the evidence submitted, on the evening of August 18, 2019, corrections officer
Longman gave Washington his prescription cholesterol medication.  (Doc. No. 72-17 at PageID
906.)  When Longman later returned to the area, Longman heard Washington say that he had been
given the wrong medication and that his chest was hurting.[2]  (*Id.*)  Shortly after midnight (therefore,
August 19, 2019), Washington repeated to corrections officer Gullette that he was not feeling well.
(Doc. No. 72-18 at PageID 661-62.)  In response, Gullette took Washington from his cell to the
clinic, one floor below.  (*Id.*)  At the clinic, Gullette checked Washington's vital signs; Gullette
determined that Washington did not have a fever and his vital signs were within normal range.

---

[1] Washington's transfer to the Montgomery County Jail was made as a "'one-for-one' trade."  (Doc. No. 72-23 at
PageID 812.)  Miami County Jail transferred Washington to the Montgomery County Jail after the Montgomery
County Jail had requested transferring an inmate "who had turned state's witness for a large case in their courts with
other inmates involved" in that case remaining at the Montgomery County Jail.  (*Id.*; *see also* Doc. No. 72-19 at
PageID 915.)
[2] Longman testified that he is confident that he did not give Washington the wrong medication, and he certainly did
not intentionally do so if, in fact, the wrong medication was provided to Washington.  (Doc. No. 72-17 at PageID
659.)

(*Id.*)  Gullette told Washington that he would relay Washington's complaint to the on-call nurse to see how she wanted to proceed.  (*Id.*)  Washington became agitated and insisted that Gullette call his family and send him to the hospital.  (*Id.*)

Washington began to threaten Gullette and insisted that he would not leave the clinic until Gullette had arranged for him to go to the hospital.  (Doc. No. 72-18 at PageID 662.)  Washington took an aggressive stance and threatened to physically harm Gullette if Gullette did not get him medical attention right away.  (*Id.*; Doc. No. 72-17 at PageID 659.)  Gullette asked Longman, who had been standing by, to enter the clinic.  (Doc. No. 72-18 at PageID 662; Doc. No. 72-17 at PageID 659.)  Gullette and Longman attempted to escort Washington from the clinic, and Washington swung his arm and hit Gullette in the face.  (*Id.*)  Gullette and Longman took Washington to the ground where he continued to struggle until threatened with the use of a taser by another corrections officer who had responded.  (*Id.*)  The taser was not used.  (*Id.*)  Gullette and Longman got Washington to his feet and escorted him to a cell.  (*Id.*)  Gullette did not choke or punch Washington.  (Doc. No. 72-18 at PageID 663; Doc. No. 72-17 at PageID 659.)

In accordance with jail policy, Gullette completed a response to resistance report concerning the August 18/19 Incident.  (Doc. No. 72-18 at PageID 663.)  Also in accordance with jail policy, the report/incident was reviewed by the shift supervisor, Collette, Marion, the Chief Deputy, and Duchak, all of whom agreed that Gullette and Longman acted appropriately to address Washington's behavior.  (Doc. No. 75-23 at PageID 1062.)

### C.  **The Pepper Spray Incident at the Montgomery County Jail**

Washington alleged in his Complaint that, on or about December 1, 2019, another inmate at the Montgomery County Jail sprayed him with pepper spray (the "Pepper Spray Incident"). (Doc. 30 at PageID 322-23.)

Based on the evidence submitted, on November 25, 2019, two inmates, Ryan Hill ("Inmate

Hill") and LeAndre Ward ("Inmate Ward") were housed with Washington at the Montgomery County Jail. (Doc. No. 81-2 at PageID 1432.) Inmate Hill contacted Defendant Hoskins through the housing unit's intercom system to request a toilet plunger. (*Id.*) Hoskins then used a control box to open Inmate Hill's cell so Inmate Hill could retrieve the plunger that Hoskins placed in the housing unit in response to Inmate Hill's request. (*Id.*) Hoskins next saw Inmate Ward emerge from his cell and start punching Inmate Hill. (*Id.*) Additional officers arrived and secured Inmate Hill and Inmate Ward. (*Id.* at PageID 1432-43.) The Montgomery County Sheriff's Office conducted a formal internal investigation into the fight between the inmates. (*Id.*) Hoskins was cleared of any involvement with the inmates' fight. (*Id.*)

In the early morning of December 1, 2019, Defendant Williams contacted Inmate Ward at his cell to handcuff and transport him to speak with jail medical staff. (Doc. No. 81-3 at PageID 1436.) Williams was authorized to carry pepper spray, and, during that shift, he was using his personal holster to carry a cannister of pepper spray. (*Id.*) Inmate Ward was returned to his cell approximately ten minutes after his contact with Williams. (*Id.*) At the end of Williams' shift, as he prepared to begin an overtime shift as a road patrol officer, Williams noticed his pepper spray holster was empty and thought he had forgotten his canister at home. (*Id.*)

Later that day, Maxamillion Thomas ("Inmate Thomas") pepper sprayed other inmates. (Doc. No. 81-4.) Jail Captain Brad Daugherty ("Daugherty") investigated the incident. (*Id.* at PageID 1439.) An inmate admitted to Daugherty that he gave the pepper spray canister to Inmate Thomas sometime earlier in the day on the date of the incident. (*Id.* at PageID 1443.) Additionally, Defendant Williams' interaction with Inmate Ward earlier in the day (referenced in the prior paragraph) was video-recorded. (Doc. No. 81-3 at PageID 1436.) Upon reviewing the footage, Williams could see that he had his canister of pepper spray when he first entered Inmate Ward's

cell, but the canister was gone when he left the cell with Inmate Ward. (*Id.*) Williams believes he may have inadvertently knocked the pepper spray canister out of his holster when he drew his handcuffs in Inmate Ward's cell. (*Id.* at PageID 1437.)

Neither Williams nor Hoskins provided pepper spray to any inmate. (Doc. No. 81-3 at PageID 1437; Doc. No. 81-2 at PageID 1433.) Hoskins was cleared of any involvement in the Pepper Spray Incident, and Williams was disciplined only for failing to maintain control of the pepper spray canister and received a three-day suspension. (Doc. No. 81-2 at PageID 1433; Doc. No. 81-3 at PageID 1437.) Williams was cleared of any other involvement in the Pepper Spray Incident, and investigation of the incident determined that allegations that prison staff were involved were unfounded. (Doc. No. 81-3 at PageID 1437.) At Washington's deposition, he admitted that he had no proof to support his allegation that jail staff were involved in the Pepper Spray Incident. (Doc. No. 82-2 at PageID 1838-39.) Inmate Thomas was criminally prosecuted for the Pepper Spray Incident in Dayton Municipal Court, including a falsification charge—to which he pleaded guilty—that he unlawfully and knowingly made a false statement with the purpose to incriminate Defendant Hoskins. (Doc. No. 81-4 at PageID 1444; Doc. No. 81-6.)

**D. The Taser Incident at the Miami County Jail**

Washington alleged in his Complaint that, on or about October 12, 2020, while his hands were hanging outside of his cell, Defendant Welbaum grabbed his hands, pulled his arms until his head slammed into the cell bars, and then tased him (the "Taser Incident"). (Doc. 30 at PageID 326.)

Based on the evidence submitted, on October 12, 2020, Washington had covered the camera in his cell. (Doc. No. 75-12 at PageID 896.) Welbaum witnessed Washington throwing items out of the cell's food tray slot and encouraging another inmate to do the same. (*Id.*) Both inmates had their arms sticking out of the food tray doors. To prevent them from throwing more

items out of their cells, Welbaum needed them to remove their arms so that the slots could be closed in order to maintain officer and inmate safety in the booking area adjacent to the cells.  (*Id.*; *see also* Doc. No. 75-24 ("Inmates and staff must travel by those cells to get to other units of the Jail.  Food tray doors remaining open and inmates putting their arms through the opening is a huge safety concern.").)

Welbaum conferred with Defendant Collette (an Assistant Jail Administrator), and they agreed that, should the inmates refuse to move their arms after being commanded and given a chance to do so, use of a taser would be appropriate to obtain compliance.  (Doc. No. 75-12 at PageID 896.)  Welbaum also called for assistance from two other corrections officers.  Welbaum had an armed taser in his right hand that Washington could see, and the officers commanded Washington to remove his arm from the food tray slot.  (*Id.*)  Washington refused to remove his arm, despite several seconds passing after the command.  (*Id.*)  One of the other corrections officers grabbed Washington's arm, Welbaum yelled taser three times, and then Welbaum applied a taser in drive stun mode to Washington's forearm. (*Id.*)  The other corrections officer released Washington's arm as Washington withdrew it from the slot, and Welbaum removed the taser.  (*Id.*)  The other corrections officer then shut the food tray slot.  (*Id.*)  When the corrections officers approached the other inmate who had been throwing items, that inmate removed his arm upon being commanded to do so.  (*Id.*)

Welbaum completed a response to resistance report concerning the taser deployment against Washington.  (Doc. No. 75-12 at PageID 897.)  Per jail policy, the report/incident was reviewed by the shift supervisor, Collett, Marion, the Chief Deputy, and Duchak, all of whom agreed that Welbaum acted appropriately and within jail policy in warning Washington numerous times and in using the taser.  (Doc. No. 75-23 at PageID 1063.)

10

### E. **November 16, 2020 Incident at the Miami County Jail**

Washington alleged in his Complaint that, on or about November 16, 2020, Defendant Goff made a racially insensitive comment (that Goff characterized as a joke) and that Defendants Goff and Carson laughed together at the comment (the "November 16 Incident"). (Doc. 30 at PageID 326-27.) Washington alleged that he filed a grievance against Goff regarding the comment, Carson (Goff's supervisor) responded in writing to the grievance, Washington objected to the grievance, and Carson responded again in writing and informed Washington that Goff had been reprimanded and provided an apology. (*Id.*)

Based on the evidence submitted, on November 16, 2020, Goff was escorting Washington in the jail when Washington (who is black) asked about the location of several black inmates who had been bonded out of the jail. (Doc. No. 75-2 at PageID 847.) Goff responded that those inmates had been sold.[3] (*Id.*) Washington then filed a grievance in response to the comment. (*Id.*) Carson counseled Goff regarding the statement and indicated to him that Goff should not make comments that could possibly be construed as racial in nature or cause offense. (*Id.* at PageID 848; *see also* Doc. No. 75-13 at PageID 901.) Additionally, Washington (who is Muslim) testified that a corrections officer called him a "towelhead," made jokes about Washington not eating pork, and made a comment about Washington being violent and a "little terrorist" because he is Muslim. (Doc. No. 77 at PageID 1178-80.)

### F. **Alleged Medical and Dental Care Issues**

Washington also alleged in his Complaint that, throughout his stay at the two jails, he experienced serious medical and dental issues that went unaddressed despite his multiple requests

---

[3] Goff stated in a sworn declaration that his comment was made as a joke, believing that he had a good relationship with Washington and that Washington would understand it as a joke, and that he did not intend the comment to offend Washington. (Doc. No. 75-2 at PageID 847.)

for attention.  (Doc. No. 30 at PageID 324-25.)

Based on the evidence submitted, nurses and the jail's physician did attempt to work with Washington on providing care to him.  (Doc. No. 75-23 at PageID 1063-64.)  For example, Washington complained about his wisdom teeth, and he was provided with the mouthwash paroex to help alleviate his problems.  (*Id.*)  Washington also made a request for medical services regarding his cholesterol, and the next day a reply was provided that his request for a heart healthy diet was being processed, assured him that his cholesterol would be checked in three months, and gave him advice on managing the issue.  (*Id.*)  Additionally, Washington was transported to the emergency room in response to the August 18/19 Incident; following a separate incident where he punched a wall and injured his hand; and, following another separate incident where he injured his hand again after assaulting another inmate.  (*Id.*)  Furthermore, approximately a month after the August 18/19 Incident, Washington refused to come to the clinic to receive services.  (*Id.*)

Additionally, on August 7, 2020, the Miami County judge presiding over Washington's criminal case granted him a medical furlough with house arrest lasting between August 13 and 19, 2020, at which point Washington was required to return to the Miami County Jail.  (Doc. No. 72-23 at PageID 810.)  The furlough was intended to allow Washington to undergo an elective dental procedure on his wisdom teeth.  (*Id.*)  However, rather than having the procedure performed and returning to the jail, Washington escaped, an arrest warrant was issued for his arrest, and Washington was subsequently apprehended in Oklahoma.  (*Id.* at PageID 811.)  As a result, Washington was charged with Escape in the Miami County Common Pleas Court.  (*Id.*)

### G.  **Complaint and Current Motions**

Washington filed this action on May 5, 2020.  (Doc. No. 1; Doc. No. 3.)  On January 12, 2021, he filed his Second Amended Complaint (the "Complaint"), which is the operative complaint in this case; it contains 39 separate counts.  (Doc. No. 30.)  Duchak, Marion, Collett, Carson,

Welbaum, Streck, and Roy are being sued in both their official and individual capacities.  (*Id.* at PageID 314-15.)

On June 10, 2022, the Miami Defendants filed their motion for summary judgment (the "Miami Defendants' MSJ").  (Doc. No. 78.)   The same day, the Montgomery Defendants filed their motion for summary judgment (the "Montgomery Defendants' MSJ").  (Doc. No. 81.)  On June 14, 2022, the Court issued a Notice to Washington, informing him that "[t]wo motions for summary judgment were recently filed in this case" and, *sua sponte*, modifying "the default briefing schedule for those motions as set forth in S.D. Ohio Civ. R. 7.2(a)(2) such that Plaintiff's response must be filed with the Court on or before July 29, 2022."  (Doc. No. 86.)  Therefore, the Court provided Washington with more than twice the amount of time to file a response to the motions than he would have received under the default rule.  Yet, Washington failed to file any response to the motions on or before July 29, 2022.  On August 12, 2022—the deadline established by the Court in the Notice (Doc. No. 86) for the Miami Defendants and the Montgomery Defendants to file a reply brief in support of their motions—the Miami Defendants filed a notice informing the Court that Washington had failed to respond to their motion for summary judgment and requested that the Court consider Washington's "failure to prosecute his case as further grounds for dismissing this action in addition to those raised in their Motion for Summary Judgment."  (Doc. No. 87.)  The motions are ripe for review.

## III.  <u>ANALYSIS</u>

The Miami Defendants argue that they are entitled to summary judgment on all claims against them (<u>i.e.</u>, Counts One through Sixteen and Thirty-Two through Thirty-Nine) and ask the Court to dismiss those claims and enter judgment in their favor.  (Doc. No. 78 at PageID 1311.)  The Miami Defendants assert that Washington "is unable to establish disputed issues of material fact justifying a trial on" the claims against them; Washington "is unable to meet the significant

burden in demonstrating that the policies or customs of Miami County deprived him of constitutional rights"; "many of [the individual defendants] played no direct role in the incidents [Washington] complains of"; the individual defendants "are entitled to qualified immunity on [Washington's] federal claims"; various claims "have no support in law or the factual record developed during discovery"; and, Washington's state law claims fail because of Miami County's immunity from tort claims and the individual defendants' immunity as employees of a political subdivision. (*Id.* at PageID 1318.)

The Montgomery Defendants similarly argue that they are entitled to summary judgment on all claims against them. (Doc. No. 81 at PageID 1402.) They assert that "[n]either the facts nor the law supports any of the Plaintiff's claims." (*Id.* at PageID 1404.)

## A. <u>Federal Law Claims</u>

All of Washington's federal claims are brought pursuant to 42 U.S.C. § 1983 ("Section 1983"). (*See* Doc. No. 30.) Section 1983 "created a species of federal tort liability for individuals to sue state and local officers for deprivations of constitutional rights." *Thompson v. Clark*, 212 L. Ed. 2d 382, 142 S. Ct. 1332, 1336-37 (2022). To prevail on a Section 1983 claim, a plaintiff "must satisfy two elements: (1) 'the deprivation of a right secured by the constitution or laws of the United States,' and (2) 'the deprivation was caused by a person acting under color of state law.'" *Brickles v. Vill. of Phillipsburg, Ohio*, 524 F. Supp. 3d 775, 783 (S.D. Ohio 2021) (quoting *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995)).[4]

### 1. <u>Claims Against Certain Defendants in Their Official Capacity</u>

As noted above, several of the Miami Defendants and the Montgomery Defendants are

---

[4] Section 1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...." 42 U.S.C. § 1983.

sued in both their official capacity and their individual capacity. Specifically, Duchak, Marion, Collett, Carson, Welbaum, Streck, and Roy—all of whom are affiliated with either the Miami County Sheriff's office or the Montgomery County Sheriff's office—are being sued in both their official and individual capacities. (Doc. No. 30 at PageID 314-15.) Additionally, many of the Section 1983 claims (specifically counts 1, 2, 3, 4, 5, 17, 18, 19, 20, 21, and 33) brought against those seven defendants are either brought against the Miami County Board of Commissioners and those who are affiliated with the Miami County Sheriff's office or brought against the Montgomery County Board of Commissioners and those who are affiliated with the Montgomery County Sheriff's office. (*See* Doc. No. 30.)

"Section 1983 individual-capacity[5] claims differ from Section 1983 official-capacity claims." *Myers v. Montgomery Cnty. Bd. of Comm'rs*, No. 3:18-cv-409, 2019 WL 2567748, at *3 (S.D. Ohio June 21, 2019) (citing *Peatross v. City of Memphis*, 818 F.3d 233, 240-41 (6th Cir. 2016)). "[A]n individual-capacity claim seeks to hold an official personally liable for the wrong alleged," while "[a]n official-capacity claim against a person is essentially a claim against the municipality." *Peatross*, 818 F.3d at 241. A Section 1983 claim against an officer or employee of a governmental entity in his or her official capacity "is superfluous or redundant" if that same claim is brought against that governmental entity. *Day v. DeLong*, 358 F. Supp. 3d 687, 700 (S.D. Ohio 2019); *see also Myers*, 2019 WL 2567748, at *3; *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

Here, as in *Myers*, "the Montgomery County Board of Commissioners is named, thus Montgomery County stands accused of the Section 1983 violations" brought against that board of

---

[5] Individual-capacity actions are sometimes referred to as personal-capacity actions, and vice-versa. *Kentucky v. Graham*, 473 U.S. 159, 165 n. 10 (1985).

commissioners. *Myers*, 2019 WL 2567748, at *3; *see also Day*, 358 F. Supp. 3d at 699-700. Likewise, the Miami County Board of Commissioners is named, thus Miami County stands accused of the Section 1983 violations brought against that board of commissioners. *Id.* Additionally, the Section 1983 claims brought against those seven defendants in their official capacity are "construed as claims against the municipality, i.e., the County." *Myers*, 2019 WL 2567748, at *3 (claims against county sheriff and corrections officer of county jail in their official capacity construed as claims against the county). Thus, the Section 1983 claims that are brought against Miami County and against Duchak, Marion, Collett, Carson, and Welbaum in their official capacities are redundant. *Id.* Likewise, the Section 1983 claims that are brought against Montgomery County and against Streck and Roy in their official capacities are redundant. *Id.* Therefore, Counts 1, 2, 3, 4, 5, and 33 against Duchak, Marion, Collett, Carson, and Welbaum in their official capacities are dismissed. *Id.* (dismissing Section 1983 official capacity claims because they were redundant with the Section 1983 claims against the municipality); *Jackson v. Shelby Cnty. Gov't*, No. 07-6356, 2008 WL 4915434, at *2 (6th Cir. Nov. 10, 2008) (affirming summary judgment on "claims against the sheriff in his official capacity because those claims mirror the claims against the County, and are therefore redundant"). And, Counts 17, 18, 19, 20, and 21 against Streck and Roy in their official capacities are dismissed. *Id.*

## 2. Counts 1 and 17 (Section 1983 Fourteenth Amendment Violation – Custom, Policy, Pattern, and/or Practice of Tolerating the Use of Excessive Force)

Counts 1 and 17 are claims brought pursuant to Section 1983 in which Washington alleges that certain defendants violated the Fourteenth Amendment through a custom, policy, pattern, and/or practice of tolerating the use of excessive force. (Doc. No. 30 at PageID 314-15, 328-31, 344-46.) More specifically, Count 1 of the Complaint alleges that the "Miami County Defendants permit, tolerate, and are deliberately indifferent to a pattern and practice of excessive force by its

16

corrections officers at the jail," and that "[t]his widespread tolerance of excessive force by corrections officers constitutes a county policy, practice, pattern, and custom, and led to Defendants Gullette and Longman's attack of Plaintiff on August 18, 2019 and Defendant Walbaum's attack of Plaintiff on or about October 12, 2020, without justification." (Doc. No. 30 at PageID 328-31.) Count 17 of the Complaint has similar allegations, but is brought against the "Miami County Defendants" and their alleged "widespread tolerance of excessive force by its corrections officers" that allegedly "led to Defendants Hoskins and Williams' participation in the pepper spray attack against Plaintiff and other inmates." (*Id.* at PageID 344- 46.)

This type of Section 1983 claim—one where the plaintiff alleges that a governmental policy, practice, or custom resulted in an alleged constitutional injury—is typically referred to as a "*Monell* claim," a reference to the Supreme Court's opinion in *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658 (1978).

As an initial matter, the Complaint indicates that Counts 1 and 17 are not only brought against Miami County and Montgomery County, but also against the following people in their individual capacity (personal capacity): Duchak, Marion, Collett, Carson, Welbaum, Streck, and Roy. (Doc. No. 30 at PageID 314-15, 328, 344.) However, "a *Monell* claim against a party in an individual capacity is improper." *Davis v. 36th Dist. Ct.*, No. 2:20-cv-12145, 2021 WL 2402083, at *4 (E.D. Mich. June 11, 2021) (internal quotation marks omitted); *see also Phillips v. City of Cincinnati*, No. 1:18-cv-541, 2019 WL 2289277, at *6 (S.D. Ohio May 29, 2019) (prohibiting amendment to complaint to add *Monell* claims against individuals in their individual capacity; the purpose "of *Monell* is to impose liability on a <u>municipality</u> under certain circumstances—not individuals") (emphasis in original); *Jackson v. Cuyahoga Cnty.*, No. 1:20-cv-02649, 2021 WL 2018853, at *5 (N.D. Ohio May 20, 2021) ("a *Monell* claim is one brought against a municipality

17

or other local governmental agency—not an individual—for a governmental custom, policy, or practice that results in alleged constitutional injury," so "to the extent that Plaintiffs purport to allege *Monell* claims against Mills, Pinkney, and Ivey in their individual capacities throughout the Complaint, such claims are dismissed"). Moreover, Counts 1 and 17 contrast with some of Washington's other Section 1983 claims that are brought only against particular individuals, allege personal involvement by the particular individuals in the alleged constitutional violation, and do not allege that a governmental policy, practice, or custom resulted in the alleged constitutional injury (e.g., Count 34 alleging a Section 1983 claim against Welbaum for Welbaum's alleged use of excessive force in "assaulting and tasing" Washington while in his cell). The Court grants Duchak, Marion, Collett, Carson, and Welbaum summary judgment on Count 1 with respect to the claim against them in their individual capacity and grants Streck and Roy summary judgment on Count 17 with respect to the claim against them in their individual capacity.

Next, the Court addresses Counts 1 and 17 with respect to the governmental entities: Miami County and Montgomery County. In line with the first element for Section 1983 claims (set forth above), "[t]here can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007). However, analysis of the second element for Section 1983 claims (i.e., causation by a person acting under color of state law) is less straight forward when brought against municipalities rather than individuals. "While municipalities are considered 'persons' within the meaning of Section 1983, they cannot be held liable simply because they employ a tortfeasor." *Brickles*, 524 F. Supp. 3d at 783; *see also Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) ("Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior*"). Instead, "[a] plaintiff may only hold a local government entity liable under § 1983 for the entity's own

18

wrongdoing." *Gregory*, 444 F.3d at 752.  Therefore, "a plaintiff seeking to impose liability on a municipality under Section 1983 must 'identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.'" *Brickles*, 524 F. Supp. 3d at 783 (quoting *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997)); *see also Monell*, 436 U.S. at 691.  "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bryan Cnty.*, 520 U.S. at 403-04.  "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.*  Therefore, "[t]o establish municipal liability, a plaintiff must (1) 'identify conduct properly attributable to the municipality' and (2) 'demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.'" *Brickles*, 524 F. Supp. 3d at 784 (quoting *Bryan Cnty.*, 520 U.S. at 404) (emphasis in original). Ultimately, "'a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Id.*

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).  "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.*

The fourth avenue for proving the existence of a municipality's illegal policy or custom

includes showing that the municipality had an unwritten policy, practice, or custom of condoning the use of excessive force.  *Thomas*, 398 F.3d at 429.  Such "inaction theory" claims require a plaintiff to show: "(1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the moving force or direct causal link in the constitutional deprivation."  *Id.* (internal quotation marks omitted and alterations adopted).

Here, the Court need only address the first requirement for the inaction theory claims set forth in Counts 1 and 17 of the Complaint: "the existence of a clear and persistent pattern of illegal activity."  *Thomas*, 398 F.3d at 429.  "The mere existence of complaints, without more, is not sufficient to allow a reasonable jury to find the existence of a clear and persistent pattern of illegal activity."  *Stanfield v. City of Lima*, 727 F. App'x 841, 852 (6th Cir. 2018) (affirming summary judgment for city and police chief because plaintiff could not establish that the city had a custom of tolerance for federal rights violations).  Additionally, "to establish a pattern of illegal activity the plaintiff must go beyond the facts of [his or] her own case and show other instances of the alleged rights violation have occurred in other cases."  *Abdulsalaam v. Franklin Cnty. Bd. of Comm'rs*, 637 F. Supp. 2d 561, 577 (S.D. Ohio 2009).  Apart from the alleged incidents taken against Washington himself, there is no evidence of any other incident involving the alleged (or actual) use of excessive force.[6]  There is no genuine issue of material fact concerning the lack of an "existence of a clear and persistent pattern of illegal activity."  *Thomas*, 398 F.3d at 429.

---

[6] In a prior filing, Defendants stated that Washington "made no effort to obtain discovery from the Defendants" and "never served a single discovery request on any Defendant in this case"—statements that Washington did not dispute in his reply to that filing.  (*See* Doc. No. 89 at PageID 1876; Doc. No. 90; Doc. No. 91 at PageID 1884.)

Therefore, Miami County and Montgomery County also are entitled to summary judgment on Counts 1 and 17, respectively.[7]  *Id.* at 433-34 (affirming summary judgment for municipality on Section 1983 claim; evidence that police officers had used excessive force in the particular case before the court was insufficient to establish a pattern of illegal activity, as required for municipal liability under inaction theory); *Siler v. Webber*, 443 F. App'x 50, 54 (6th Cir. 2011) (affirming summary judgment for municipality on Section 1983 claim; single isolated incident of abuse described in officer's affidavit fell short of the requirement to show the existence of a clear and persistent pattern of illegal activity); *Wooten v. City of Chattanooga, Tenn.*, No. 1:18-cv-206, 2020 WL 1480452, at *5 (E.D. Tenn. Mar. 26, 2020) (granting summary judgment to defendants on custom-of-tolerance claim; explaining that the plaintiff "has made no effort to establish the existence of other excessive force complaints or claims").

### 3. Counts 2 and 18 (Section 1983 Fourteenth Amendment Violation – Deliberate Indifference and Failure to Train and Supervise Corrections Officers and Personnel)

The second and eighteenth counts in the Complaint are claims brought pursuant to Section 1983 against Miami County, Duchak, Marion, Collett, Carson, Welbaum, Montgomery County, Streck, and/or Roy.  (Doc. No. 30 at PageID 314-15, 331-34, 346-49.)  Washington alleges that these particular defendants violated the Fourteenth Amendment through deliberate indifference to a failure to train and supervise corrections officers and personnel at the jail.  (*Id.*)  Washington more specifically alleges that the "Miami County Defendants" failed "to train and supervise corrections officers and other jail personnel on how to interact with people in custody, including how to use force appropriately in a correctional setting, how to not sadistically abuse inmates, and refraining from engaging in racial and religious discrimination against minority inmates."  (*Id.* at

---

[7] The Court need not, and does not, address any of the Defendants' other arguments concerning Counts 1 and 17.

PageID 331.) Washington makes the same allegation regarding the "Montgomery County Defendants," with the exception of alleged racial and religious discrimination. (*Id.* at PageID 346.)

As set forth above, the third avenue for proving the existence of a municipality's illegal policy or custom involves showing that the municipality had a policy of inadequate training or supervision. *Thomas*, 398 F.3d at 429; *see also Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) ("[o]ne way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision"). "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis*, 455 F.3d at 700. Regarding the second requirement, "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of a failure to train." *Id.* (internal quotation marks omitted).

Here, as in *Ellis*, Washington's municipal liability claim fails under the second requirement for a failure to train or supervise claim. There is insufficient evidence that either Miami County or Montgomery County was deliberately indifferent to inadequate training or supervision concerning the dangers alleged by Washington. *Ellis*, 455 F.3d at 700-01. Apart from the alleged incidents involving Washington himself, there is no evidence of any other similar incidents. *See Ellis*, 455 F.3d at 701 (ten reports of abuse over a two year period "were not sufficient to permit a reasonable jury to find that the [municipality] had been deliberately indifferent"; "[t]o establish deliberate indifference through these reports [of the only two incidents that arguably rose to the

level of the incident involving plaintiff], [plaintiff] would have had to allege and put on some evidence that two incidents of abuse over two years is an excessive number"). Thus, Washington cannot show that either county "had notice of a problem requiring additional training or supervision." *Id.* Miami County and Montgomery County are entitled to summary judgment on Counts 2 and 18, respectively. *Id.*

These claims likewise fail against the individual defendants sued in their individual-capacity. "Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Gregory*, 444 F.3d at 751. "Rather, the supervisors must have actively engaged in unconstitutional behavior." *Id.* A plaintiff "must show that the supervisors somehow encouraged or condoned the actions of their inferiors." *Id.* (affirming portion of order granting summary judgment to supervisors because the only evidence presented merely demonstrated that the supervisors failed to review their subordinates' work).

Here, there aren't even any allegations, let alone evidence, that Duchak, Collett, Streck, or Roy actively engaged in any alleged unconstitutional behavior. (*See* Doc. No. 30.) Those defendants are entitled to summary judgment on these claims. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998) (affirming grant of summary judgment in favor of police chief on Section 1983 claim for improper supervision where the police chief neither encouraged the officers to take the action leading to the incident or directed participated in the incident). Regarding Welbaum, the factual allegations against him are not that he, as a supervisor, encouraged or condoned the actions of his inferiors (*id.* at PageID 326); instead, those allegations relate to actions taken by Welbaum that are the specific subject of other Section 1983 claims brought against Welbaum for use of excessive force and retaliation (Counts 34 and 35, addressed below). (*Id.* at PageID 360-61.) A Section 1983 claim against Welbaum for failure to train and supervise is

inapposite.[8]

Regarding Marion, the only allegations (not even evidence) that specify his actions are in a single paragraph, which alleges Marion "mockingly told [Washington] 'sue me again' when [Washington] complained" and told Washington he "is unconcerned with [Washington's] claims because 'we have insurance.'" (Doc. No. 30 at PageID 328.) Such allegations are unrelated to, and do not provide evidence to support, a failure to train or failure to supervise claim. Therefore, Marion is entitled to summary judgment on Count 2.

Finally, regarding Carson, Washington alleges that Carson laughed at Goff's racially insensitive comment, Carson (Goff's supervisor) later told Washington that he would advise Goff not to attempt to joke with Washington, and Carson apologized for laughing and informed Goff that Goff's joke was in poor taste and not to make jokes that Washington might find offensive. (Doc. No. 30 at PageID 327.) As explained in detail below regarding Counts 32 and 33, while the underlying alleged disparaging statements are deplorable and reprehensible, the conduct does not rise to the level of a constitutional violation to support the Section 1983 claim. *Brickles*, 524 F. Supp. 3d at 783 (an element of a Section 1983 claim is the deprivation of a right secured by the Constitution). Therefore, Carson too is entitled to summary judgment on Count 2.

### 4. Counts 3 and 19 (Section 1983 Fifth and Fourteenth Amendment Violation – Due Process)

The third and nineteenth counts in the Complaint are claims brought pursuant to Section 1983 against Miami County, Duchak, Marion, Collett, Carson, Welbaum, Montgomery County, Streck, and/or Roy. (Doc. No. 30 at PageID 314-15, 334, 349-50.) Washington alleges that these particular defendants violated his due process rights under the Fifth and Fourteenth Amendments.

---

[8] Evidence supports that Welbaum received training on jail policies and procedures, including the use of force and the use of a taser. (Doc. No. 75-23.) Gullette and Longman likewise received training on jail policies and procedures, including the use of force. (*Id.*)

(*Id.*)  More specifically, he alleges that he filed multiple grievances related to various incidents, deprivation of medical care, unsuitable jail conditions, etc.; that he filed these grievances in accordance with the defendants' policies; and, that these particular defendants denied his right to be heard regarding those grievances.  (*Id.*)

To establish a procedural due process violation under Section 1983, a plaintiff must show that he or she possessed a protected liberty or property interest and that he or she was deprived of that interest without due process of law.  *Williams v. Wilkinson*, 51 F. App'x 553, 556 (6th Cir. 2002); *see also Miller v. Haines*, 156 F.3d 1231 (Table), 1998 WL 476247, at *1 (6th Cir. 1998) ("[f]irst, it must be determined whether there exists a liberty or property interest with which the state has interfered" and, "[s]econd, the court must analyze the procedures available to the plaintiff to determine whether they were constitutionally sufficient").  "Prisoners have narrower liberty interests than other citizens as lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *Grinter v. Knight*, 532 F.3d 567, 573 (6th Cir. 2008).  For example, "[p]rison inmates do not have a constitutionally protected right to a grievance procedure."  *Miller*, 1998 WL 476247, at *1.  There also is no statutory or common law right to an investigation of a prisoner grievance.  *Soledad v. Webb*, 1:18-cv-126, 2018 WL 2750318, at *7 (S.D. Ohio May 1, 2018), *report and recommendation adopted by* 2018 WL 2735658 (S.D. Ohio June 7, 2018).  "Nor does a prison official's alleged failure to adequately investigate claims of misconduct rise to the level of encouragement that would make the official liable for such misconduct."  *Id.* (internal quotation marks omitted).  Moreover, "[f]ailing to follow proper procedures is insufficient to establish an infringement of a liberty interest."  *Grinter*, 532 F.3d at 574 (finding that plaintiff-prisoner's Section 1983 due process claims failed).

Here, the evidence does not support that Washington possessed a protected liberty or property interest for purposes of his due process claims. Washington does not have a constitutionally protected right to a grievance procedure, and, even if the defendants had neglected to respond or investigate Washington's grievances, they would not be liable under Section 1983. *See Soledad*, 2018 WL 2750318, at *7 (plaintiff-prisoner's claim that the defendants failed to respond to his grievances and failed to conduct investigations of his complaints was dismissed at the screening stage). Therefore, these claims must fail. *Williams*, 51 F. App'x at 556; *Miller*, 1998 WL 476247, at *1 (jail policy did not create a protected liberty interest); *Bonilla v. Corr. Corp. of Am.*, No. 4:11cv1349, 2012 U.S. Dist. LEXIS 9983, 2012 WL 263378, at *13 (N.D. Ohio Jan. 27, 2012) (defendants' alleged failure to respond to incarcerated plaintiff's request, to which he received no response, was insufficient to demonstrate interference with a liberty or property interest). Furthermore, although Washington makes conclusory allegations in the Complaint, there is no evidence to support that the defendants "denied his right to be heard regarding" the grievances that he filed. (*See also, e.g.,* Doc. 30 at PageID 326-27 (Washington alleging that he filed a grievance, Carson responded to the grievance, Washington objected to the grievance, and Carson responded again and informed Washington that Goff had been reprimanded and provided an apology); Doc. No. 81-1 (Washington submitted only one grievance at Montgomery County jail— an electronic submission purporting to be a grievance by Inmate Ward).) Defendants are entitled to summary judgment on Counts 3 and 19.

5. **Counts 4 and 20 (Section 1983 Eighth Amendment Violation – Participation in and Deliberate Indifference to Unnecessary and Wanton Infliction of Pain)**

The fourth and twentieth counts in the Complaint are claims brought pursuant to Section 1983 against Miami County, Duchak, Marion, Collett, Carson, Welbaum, Montgomery County, Streck, and/or Roy. (Doc. No. 30 at PageID 314-15, 335, 350.) Washington alleges that these

26

particular defendants violated the Eighth Amendment through participation in, and deliberate indifference to, unnecessary and wanton infliction of pain. (*Id.*) More specifically, he alleges that he required mental and dental care while at the jails, but was refused such care. (*Id.*) He also alleges that he required "proper meals to control his high cholesterol and other health conditions, but was denied such meals." (*Id.*) He asserts that these defendants were deliberately indifferent to his serious medical and dental needs, and that such deliberate indifference amounts to unnecessary and wanton infliction of pain in violation of the Eighth Amendment. (*Id.*)

During the relevant time period, Washington was a pretrial detainee. (Doc. No. 75-23 at PageID 1058; Doc. No. 82-1 at PageID 1816-17; Doc. No. 81-1 at PageID 1426.) These claims are for alleged Eighth Amendment violations. (Doc. No. 30 at PageID 335, 350.) However, "[t]he Eighth Amendment does not apply to pretrial detainees." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). Therefore, these claims fail as a matter of law. Defendants are entitled to summary judgment on Counts 4 and 20. *Murphy v. Pike Cnty. Detention Ctr.*, 474 F. Supp. 3d 876, 885 (E.D. Ky. 2020) (granting summary judgment to defendants; because plaintiff was a pretrial detainee, not a convicted person, her Section 1983 claims for violation of her Eighth Amendment rights failed to state a claim).

### 6. Counts 5, 9, 21, 25, and 35 (Section 1983 First and Fourteenth Amendment Violations -- Retaliation)

The fifth, ninth, twenty-first, twenty-fifth, and thirty-fifth counts in the Complaint are claims brought pursuant to Section 1983 against Miami County, Duchak, Marion, Collett, Carson, Welbaum, Montgomery County, Streck, Roy, Gullette, Longman, Hoskins, Williams, and/or Welbaum. (Doc. No. 30 at PageID 314-15, 336-37, 339, 351-52, 354, 360-61.) Washington alleges that these particular defendants violated the First and Fourteenth Amendments through retaliation. (*Id.*) Counts Five and Twenty-One allege that these defendants had a policy of

27

retaliation in which they permitted retaliation against incarcerated individuals, including permitting retaliation against Washington for filings grievances and "speaking out about abuse or corruption" in the jails. (*Id.*) Count Nine is related to the August 18/19 Incident, alleging that Gullette and Longman retaliated against Washington for reporting and filing grievances against Gullette. (*Id.*) County Twenty-Five is related to the Pepper Spray Incident, alleging that Hoskins and Williams retaliated against Washington for reporting Hoskins' (alleged) "releasing of inmates to fight each other for his own personal entertainment." (*Id.*) And, Count Thirty-Five is related to the Taser Incident, alleging that Welbaum retaliated against Washington for filing legal action against Miami County. (*Id.*)

"A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1998) (en banc) (plurality op.). Regarding the first element, "it is generally much harder for a prisoner to show that his conduct is protected because prison regulations are allowed to infringe on prisoners' rights as long as they are rationally related to a legitimate penological concern." *Id.* at 395. Regarding the third element, a plaintiff must establish "a causal connection between the protected conduct and the adverse action." *Id.* at 399. "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*

Here, even assuming that Washington could establish the first two elements of the claim, the evidence fails to show a causal connection between the protected conduct and the alleged adverse actions. For example, the Pepper Spray Incident (alleged adverse action) occurred two

days <u>before</u> Washington filed his grievance with the Montgomery County Jail, and Hoskins stated in a declaration that he was unaware of any complaint by inmates that he was instigating a fight between inmates until after the Pepper Spray Incident.  (Doc. No. 81-1; Doc. No. 81-2.)  As another example, Welbaum employed his taser against Washington to gain his compliance with orders for Washington to remove his arm from the food tray of his cell so that he could not throw additional items out of the food tray slot; the evidence does not support that Welbaum employed the taser because of any lawsuit, grievance, or complaint lodged by Washington.  (Doc. No. 75-12 at PageID 897.)   In short, no evidence supports that the alleged adverse actions were motivated by Washington filing grievances, making complaints, or filing a lawsuit.  *Laster v. Pramstaller*, No. 5:08-cv-10898, 2011 WL 4506956, at *13 (E.D. Mich. Sept. 8, 2011), *report and recommendation adopted by* 2011 WL 4505790 (E.D. Mich. Sept. 29, 2011) (granting summary judgment to defendants on Section 1983 claim for allegedly retaliating against plaintiff for filing grievances and complaints regarding denial of his requests for medical care; no evidence to rebut defendants' averments that they did not retaliate against plaintiff and would have taken the same actions even in the absence of plaintiff's protected activity).  Therefore, there also can be no municipal liability.  *Wilson*, 477 F.3d at 340 (6th Cir. 2007) ("[t]here can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act").  Defendants are entitled to summary judgment on Counts 5, 9, 21, 25, and 35.

### 7.  <u>Counts 8, 24, and 34 (Section 1983 Fourteenth Amendment Violations – Excessive Force)</u>

The eighth, twenty-fourth, and thirty-fourth counts in the Complaint are claims brought pursuant to Section 1983 against Gullette, Longman, Hoskins, Williams, and/or Welbaum.  (Doc. No. 30 at PageID 338-39, 353-54, 360.)  Washington alleges that these particular defendants violated the Fourteenth Amendment through use of excessive force.  (*Id.*)  Count 8 is against

Gullette and Longman and relates to the August 18/19 Incident; Count 24 is against Hoskins and Williams and relates to the Pepper Spray Incident; and, Count 34 is against Welbaum and relates to the Taser Incident.  (*Id.*)  Each of these counts alleges that the particular defendant(s) intentionally, purposefully, and knowingly used objectively unreasonable force against Washington.  (*Id.*)

A Section 1983 claim brought by a pretrial detainee against an officer for using excessive force in violation of the Fourteenth Amendment requires that the pretrial detainee (plaintiff) show "that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).  "[O]bjective reasonableness turns on the facts and circumstances of each particular case."  *Id.* at 397 (internal quotation marks omitted).  "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Id.*  "A court must also account for the legitimate interests that stem from the government's need to manage the facilty in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security."  *Id.* (internal quotation marks omitted; alterations adopted).  A non-exhaustive list of considerations that may bear on the issue of whether the force used was reasonable includes: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Id.*  Departure from local policy is not determinative. *Ayala-Rosales v. Teal*, 659 F. App'x 316, 321 (6th Cir. 2016).  Additionally, "[t]he law does not require officers to use progressive force nor does it prescribe the ideal type or

amount of force allowed." *Id.* (internal quotation marks omitted). "Instead, it requires only objectively reasonable force based on all of the facts and circumstances surrounding its use." *Id.*

Here, regarding the Pepper Spray Incident, there is no evidence of <u>any</u> force used against Washington by Hoskins or Williams, let alone unconstitutionally excessive force. And, there is no evidence to support that they purposefully or knowingly caused other inmates to use the pepper spray against Washington. Regarding the August 18/19 Incident and the Taser Incident, the Court finds that the Miami Defendants have shown that there is no genuine dispute as to any material fact and Gullette, Longman, and Welbaum are entitled to judgment as a matter of law on the Section 1983 excessive force claims. There is not evidence on which a jury could reasonably find "that the force purposefully or knowingly used against [Washington] was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97; *see also Ayala-Rosales*, 659 F. App'x at 322 (granting summary judgment to defendant corrections officer on pretrial detainee's Section 1983 excessive force claim, although witnesses offered differing accounts, where none of the disputed facts were essential to a determination that the officer's use of force was not objectively unreasonable); *O'Hair v. Winchester Police Dept.*, No. 16-6235, 2017 WL 7240652, at *3 (6th Cir. Oct. 18, 2017) (affirming dismissal of Section 1983 claim for excessive force made against officers who tased and kicked plaintiff while he was unarmed, causing kidney failure and other injuries, when plaintiff was apprehended after escape attempt; finding that the force used by the defendants was objectively reasonable). Therefore, Gullette and Longman are entitled to summary judgment on Count 8, Hoskins and Williams are entitled to summary judgment on Count 24, and Welbaum is entitled to summary judgment on Count 34.

**8. <u>Counts 32 and 33 (Section 1983 Fifth and Fourteenth Amendment Violations – Equal Protection)</u>**

The thirty-second and thirty-third counts in the Complaint are claims brought pursuant to Section 1983 against Goff, Carson, Miami County, Duchak, Marion, Collett, Carson, and/or Welbaum. (Doc. No. 30 at PageID 338, 358-59.) Washington alleges that these particular defendants violated his equal protection rights under the Fifth and Fourteenth Amendments. (*Id.*) Count 32 alleges that Goff and Carson violated Washington's "right to equal protection by racially disparaging [him] because [he] is black" and that "[s]imilarly situated non-black inmates are not subjected to such violations." (*Id.*) Count 33 alleges that Miami County, Duchak, Marion, Collett, Carson, and Welbaum—based on the alleged actions of Goff and Carson and allegations that "[o]ther corrections officers and agents of the Miami County Defendants further disparage [Washington's] religion and religious beliefs by referring to [Washington] as 'towelhead' and other disparaging names"—violated Washington's equal protection rights by failing to take corrective action, thus allegedly "manifesting deliberate indifference to the racial and religious discrimination perpetrated against" Washington. (*Id.*)

"The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011). "To establish a violation of the Equal Protection Clause, a prisoner must prove that a discriminatory intent or purpose against a disfavored class or excluded group was a factor in an action taken by prison officials." *Owens v. Johnson*, No. 99-2094, 221 F.3d 1335 (Table), 2000 WL 876766, at *2 (6th Cir. June 23, 2000). "The occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude." *Id.*; *see also Harlan v. Holland*, No. 1:13cv-263, 2013 WL 6668734,

32

at *4 (E.D. Tenn. Dec. 18, 2013) ("racial language and gestures of a custodial officer, without more, do not amount to a constitutional violation").

Here, there is no evidence of—and Washington does not even allege—any accompanying physical act (or other action) in the context of disparaging statements. *Harlan*, 2013 WL 6668734, at *4. The alleged disparaging statements are deplorable and reprehensible. However, the conduct does not rise to the level of a constitutional violation to support the Section 1983 claims. *Owens*, 2000 WL 876766, at *2 (affirming dismissal of Section 1983 claim that was based on defendant-correction officer's statement to plaintiff-prisoner "that all 'niggers' should be killed"); *Harlan*, 2013 WL 6668734, at *3-5 (dismissing Section 1983 claim where defendant-officer acted as if plaintiff-prisoner was a slave being beaten and used a racial epithet, and then the officer and another officer began laughing, yet the officer was never reprimanded or punished); *Dye v. LMDC*, No. 3:22-cv-P164-RGJ, 2022 WL 3570353, at *4 (W.D. Ky. Aug. 17, 2022) (dismissing plaintiff-pretrial detainee's Section 1983 claim against corrections officer who allegedly made racial, derogatory, and disrespectful comments because such comments fail to give rise to a constitutional claim). Defendants are entitled to summary judgment on Counts 32 and 33.

**B. State Law Claims (Counts 6, 7, 10, 11, 12, 13, 14, 15, 16, 22, 23, 26, 27, 28, 29, 30, 31, 36, 37, 38, and 39)**

Finally, the only remaining counts in the Complaint are state law claims. Specifically, Counts 6 and 22 are claims for Reckless Hiring, Training, Supervision, Discipline, Staffing and Retention; Counts 7, 23, and 31 are claims for Negligence and Recklessness; Counts 10, 26, and 36 are claims for Assault; Counts 11, 13, 27, and 37 are claims for Battery; Counts 12, 14, 28, and 38 are claims for Intentional Infliction of Emotional Distress; and, Counts 15, 16, 29, 30, and 39 are claims for Civil Liability for Criminal Acts.

Given that the Court now has granted judgment to the Miami Defendants and Montgomery

Defendants on all claims in the Complaint over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Washington's remaining claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction"); *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir. 2004) (although dismissal is not mandatory because supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right, "[g]enerally, if the federal claims are dismissed before trial, the state claims should be dismissed as well") (internal quotation marks omitted). Therefore, the Court dismisses the remaining claims without prejudice to refiling them in state court. *Booker v. City of Beachwood*, 451 F. App'x 521, 522-23 (6th Cir. 2011) ("Once [a] district court dismisse[s] all of the claims over which it ha[s] original jurisdiction, it act[s] squarely within its discretion by declining supplemental jurisdiction over the remaining [state law] claim[s] and dismissing [them] without prejudice").

## IV.  **CONCLUSION**

For the reasons stated above, **GRANTS, IN PART,** the Motion for Summary Judgment of Defendants Miami County Board of Commissioners, Perry Gullette, Dave Duchak, Michael Marion, Nathan Collette, Kyle Longman, Jason Goff, and Kenneth Welbaum (Doc. No. 78) and **GRANTS, IN PART,** the Defendants' Motion for Summary Judgment (Doc. No. 81).  More specifically, the Court grants summary judgment to the defendants on all of the federal claims in the Complaint: Counts 1, 2, 3, 4, 5, 8, 9, 17, 18, 19, 20, 21, 24, 25, 32, 33, 34, and 35.  The Court declines to exercise supplemental jurisdiction over the state-law claims in the Complaint (Counts 6, 7, 10, 11, 12, 13, 14, 15, 16, 22, 23, 26, 27, 28, 29, 30, 31, 36, 37, 38, and 39) and, therefore, dismisses the remaining claims without prejudice to refiling in state court.  This case shall be **TERMINATED** on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, November 29, 2022.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE